UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

CELIA OSORIO,

      Plaintiff,

   v.

ANDREW SAUL, Acting Commissioner of
Social Security,[1]

      Defendant.

Case No. 2:18-cv-02044-APG-EJY

**REPORT AND RECOMMENDATION**

Re:  Motion for Remand
(ECF No. 13)

     Plaintiff Celia Osorio ("Plaintiff") seeks judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner" or the "Agency") denying her application for disability insurance ("DIB") under Title II of the Social Security Act.  For the reasons stated below, it is recommended that the Commissioner's decision be remanded for further proceedings consistent with this Report and Recommendation.

## I.    BACKGROUND

     On April 23, 2012, Plaintiff filed an application for DIB alleging an onset of disability on January 1, 2011.  Administrative Record ("AR") 312–19.  The Commissioner denied Plaintiff's claims by initial determination on February 5, 2013, and again upon reconsideration on July 22, 2013.  AR 177–80, 185–89.  On August 8, 2013, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  AR 190–91.  After conducting a hearing on November 21, 2014 (AR 87–111), ALJ Norman L.  Bennett issued his determination that Plaintiff was not disabled on December 23, 2014 (AR 156–69).  On January 14, 2015, Plaintiff requested that the Appeals Council review the decision by the ALJ.  AR 227.  The Appeals Council granted Plaintiff's request for review on March 22, 2016, and issued an order remanding the matter to the ALJ for a new hearing.  AR 170–76.  After conducting another hearing on May 19, 2017 (AR 112–31), ALJ Bennett issued an

---

[1]    Andrew Saul is the current Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).  *See also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

1    unfavorable decision finding Plaintiff not disabled on October 26, 2017 (AR 16–33).  On November

2    13, 2017, Plaintiff requested that the Appeals Council review the new ALJ decision (AR 308–11),

3    but the Appeals Council denied the request on August 21, 2018 (AR 1–9).  When the Appeals

4    Council denied Plaintiff's second request for review, the ALJ's October 26, 2017 decision became

5    the final order of the Commissioner.  AR 1–9.  This civil action followed.

6    ## II.    STANDARD OF REVIEW

7        The reviewing court shall affirm the Commissioner's decision if the decision is based on

8    correct legal standards and the legal findings are supported by substantial evidence in the record.  42

9    U.S.C. § 405(g); *Batson v. Comm'r Soc. Sec. Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004).

10   Substantial evidence is "more than a mere scintilla.  It means such relevant evidence as a reasonable

11   mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401

12   (1971) (internal citation and quotation marks omitted).  In reviewing the Commissioner's alleged

13   errors, the Court must weigh "both the evidence that supports and detracts from the

14   [Commissioner's] conclusion." *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986) (internal

15   citations omitted).

16       "When the evidence before the ALJ is subject to more than one rational interpretation, we

17   must defer to the ALJ's conclusion." *Batson*, 359 F.3d at 1198, *citing Andrews v. Shalala*, 53 F.3d

18   1035, 1041 (9th Cir. 1995).  A reviewing court, however, "cannot affirm the decision of an agency

19   on a ground that the agency did not invoke in making its decision." *Stout v. Comm'r Soc. Sec.

20   Admin.*, 454 F.3d 1050, 1054 (9th Cir. 2006) (internal citation omitted).  Finally, the court may not

21   reverse an ALJ's decision on account of an error that is harmless. *Burch v. Barnhart*, 400 F.3d 676,

22   679 (9th Cir. 2005) (internal citation omitted).  "[T]he burden of showing that an error is harmful

23   normally falls upon the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S.

24   396, 409 (2009).

25

26

27

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### III.    DISCUSSION

**A.    <u>Establishing Disability Under The Act</u>**

To establish whether a claimant is disabled under the Act, there must be substantial evidence that:

> (a)    the claimant suffers from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months; and

> (b)    the impairment renders the claimant incapable of performing the work that the claimant previously performed and incapable of performing any other substantial gainful employment that exists in the national economy.

*Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999), *citing* 42 U.S.C. § 423(d)(2)(A).  "If a claimant meets both requirements, he or she is disabled." *Id.*

The ALJ employs a five-step sequential evaluation process to determine whether a claimant is disabled within the meaning of the Act. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. § 404.1520(a).  Each step is potentially dispositive and "if a claimant is found to be 'disabled' or 'not-disabled' at any step in the sequence, there is no need to consider subsequent steps." *Tackett*, 180 F.3d at 1098 (internal citation omitted); 20 C.F.R. § 404.1520.  The claimant carries the burden of proof at steps one through four, and the Commissioner carries the burden of proof at step five. *Tackett*, 180 F.3d at 1098.

The five steps are:

> Step 1.  Is the claimant presently working in a substantially gainful activity?  If so, then the claimant is "not disabled" within the meaning of the Social Security Act and is not entitled to disability insurance benefits.  If the claimant is not working in a substantially gainful activity, then the claimant's case cannot be resolved at step one and the evaluation proceeds to step two. *See* 20 C.F.R. § 404.1520(b).

> Step 2.  Is the claimant's impairment severe?  If not, then the claimant is "not disabled" and is not entitled to disability insurance benefits.  If the claimant's impairment is severe, then the claimant's case cannot be resolved at step two and the evaluation proceeds to step three. *See* 20 C.F.R. § 404.1520(c).

> Step 3.  Does the impairment "meet or equal" one of a list of specific impairments described in the regulations?  If so, the claimant is "disabled" and therefore entitled to disability insurance benefits.  If the claimant's impairment neither meets nor equals one of the impairments listed in the regulations, then the claimant's case cannot be resolved at step three and the evaluation proceeds to step four. *See* 20 C.F.R. § 404.1520(d).

Step 4. Is the claimant able to do any work that he or she has done in the past? If so, then the claimant is "not disabled" and is not entitled to disability insurance benefits. If the claimant cannot do any work he or she did in the past, then the claimant's case cannot be resolved at step four and the evaluation proceeds to the fifth and final step. *See* 20 C.F.R. § 404.1520(e).

Step 5. Is the claimant able to do any other work? If not, then the claimant is "disabled" and therefore entitled to disability insurance benefits. *See* 20 C.F.R. § 404.1520(f)(1). If the claimant is able to do other work, then the Commissioner must establish that there are a significant number of jobs in the national economy that claimant can do. There are two ways for the Commissioner to meet the burden of showing that there is other work in "significant numbers" in the national economy that claimant can do: (1) by the testimony of a vocational expert [("VE")], or (2) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2. If the Commissioner meets this burden, the claimant is "not disabled" and therefore not entitled to disability insurance benefits. *See* 20 C.F.R. §§ 404.1520(f), 404.1562. If the Commissioner cannot meet this burden, then the claimant is "disabled" and therefore entitled to disability benefits. *See id.*

*Id.* at 1098–99 (internal alterations omitted).

## B.    Summary of ALJ's Findings

At step one, the ALJ determined that Plaintiff did not engage in substantial gainful activity since January 1, 2011, the alleged onset date of disability, through her date last insured of December 31, 2014. AR 24. At step two, the ALJ found that Plaintiff suffered from medically determinable severe impairments consisting of "degenerative disc disease of the cervical spine, left knee osteoarthritis, and osteopenia." *Id.* At step three, the ALJ found that Plaintiff's impairment did not meet or equal any "listed" impairment in 20 C.F.R., Part 404, Subpart ("Subpt.") P, Appendix ("App.") 1. AR 26.

In preparation for step four, the ALJ found that Plaintiff had the residual functional capacity ("RFC")[2] through the date last insured to:

[P]erform light work as defined in 20 CFR 404.1567(b) except that she was capable of lifting and/or carrying twenty pounds occasionally, ten pounds frequently, standing and/or walking six hours in an 8-hour workday, sitting six hours in an 8-hour workday, occasional postural activity, and no climbing of ladders, ropes or scaffolds. She also had to avoid workplace hazards such as heights or dangerous moving machinery due to her alleged dizziness, as an apparent side effect of medication.

AR 27.

---

[2]    "Residual functional capacity" is defined as "the most you can still do despite your limitations." 20 C.F.R. § 416.945(a)(1).

At step four, the ALJ determined that "[t]hrough the date last insured, the claimant was capable of performing past relevant work as a housekeeper[, as actually and generally performed]. This work did not require the performance of work-related activities precluded by the claimant's residual functional capacity." AR 33. In making this finding, the ALJ considered the testimony of the vocational expert, who testified:

> that the claimant had past relevant work as a housekeeper, DOT code 323.687-018, light, SVP2, and a porter, DOT code 381.687-018, medium SVP 2. In comparing the claimant's residual functional capacity with the physical and mental demands of this work, the vocational expert testified that the claimant would have been capable of performing her past relevant work as a housekeeper. Pursuant to SSR [Social Security Ruling] 00-4p, I have determined that the vocational expert's testimony is consistent with the information contained in DOT.[3]

*Id.*

The ALJ concluded that "the claimant was not under a disability, as defined in the Social Security Act, at any time from January 1, 2011, the alleged onset date, through December 31, 2014, the date last insured." *Id.*

**C.   Summary of Medical Evidence**

**1.   Radiological Findings and Examinations**

On November 19, 2009, a positron emission tomography scan of Plaintiff's left lung taken at Pacific Medical Imaging & Oncology Center revealed a "smoothly marginated, non-calcified mass." AR 434. On January 5, 2010, a cytology performed at Monterey Park Hospital revealed that the mass was not malignant.[4] AR 439.

On March 22, 2011, a Dual X-ray Absorptiometry bone scan taken at Centennial Hills Hospital Medical Center showed Plaintiff had osteopenia. AR 445.

On February 3, 2011, Dr. Archie Perry, an orthopedic surgeon, began treating Plaintiff for "right-sided neck, shoulder, and arm pain that extends down to the wrist." AR 568. On May 5, 2011, Plaintiff reported "continued right arm pain and occasional numbness," and a "little pain and soreness" in her left arm. AR 565. Plaintiff "decided that she does not want any type of injection

---

[3]   DOT is an abbreviation for *Dictionary of Occupational Titles* (U.S. Department of Labor, 1991).

[4]   Plaintiff testified at her first administrative hearing that this benign tumor was removed on April 1, 2010. AR 104.

interventions as she is very skeptical of these and whether these will help or not." *Id*. Dr. Perry performed a physical examination, which revealed: "improved" extension with "25 degrees or so" and "[r]otation to the left . . . probably to about 50 degrees or so." *Id*. However, "[r]otation to the right . . . looks much stiffer[,] probably only to about 20 degrees." *Id*. Dr. Perry opined that Plaintiff is "grossly neurologically intact distally in bilateral upper extremities." *Id*. Dr. Perry decided to "continue with conservative treatment," including "start[ing Plaintiff] on a muscle relaxant using Flexeril 5mg"; "start[ing Plaintiff] on a Medrol Dosepak"; and, "[c]ontinu[ing] physical therapy." *Id*.

Between February 4, 2011 and June 26, 2012, Plaintiff enrolled in twelve sessions of physical therapy with physical therapist David Camp at Matt Smith Physical Therapy to treat her neck and right arm pain. AR 461–94.

On February 3, 2012, Dr. John Strickland, a chiropractor, treated Plaintiff for neck pain. AR 446–50. Although Dr. Strickland observed that Plaintiff had "[n]ormal" posture and gait, he opined that "[m]aximum [c]ervical [c]ompression," "[f]oraminal [c]ompression," and "[s]houlder "[d]epression" demonstrated positive results. AR 447. From March 16, 2012 through April 4, 2012, Plaintiff was treated for "neck and back pain" at Decatur Pain Center, LLC. AR 460; *see also* AR 457–59.

On January 22, 2013, Dr. David Mumford, a consultative examiner, performed a comprehensive Internal Medicine Evaluation at the request of the Nevada Bureau of Disability Adjudication. AR 519–26. At this evaluation, Plaintiff:

> state[d] that she has pain in the neck and back which is not related to an injury and for which she has received physical therapy. She has pain in the neck and mid back without radiation. The pain is constant. It is made better by the use of pain medication. She states she uses a neck brace. . . . [Plaintiff] has subjective complaints of pain in various joints including the shoulders, wrists, hips, knees, and both feet which has been diagnosed as osteoarthritis. She has sought medical attention. She has constant pain with swelling of the right hand but no stiffness. Currently, she is receiving chiropractic care.

AR 519. Dr. Mumford described Plaintiff as a "credible" female:

> with excellent cooperation, and friendly throughout the examination. Movements are noted to be normal and the claimant does not use an assistive device for ambulation. . . . She is able to turn her head normally. She is able to sit comfortably

without shifting in the chair.  She is able to stand up from a sitting position and sit up from the supine position without difficulty.  The claimant is able to get on and off the exam table without the assistance of a footstool.

AR 520.  Dr. Mumford performed an examination of Plaintiff's neck, which "show[ed] expressions of pain with range of motion testing which is normal.  There is no evidence of paravertebral muscle spasm." AR 521.  Dr. Mumford further opined that "[e]xamination of [Plaintiff's] shoulders and hands is normal.  Examination of the hips, knees, and feet is normal.  There is no evidence of deformity or swelling of any joint.  Ranges of motion are appreciated to be within normal limits for the upper and lower extremities." *Id.*  An examination of Plaintiff's back:

> [did] not reveal any evidence of significant kyphosis, lordosis, or noticeable scoliosis.  Palpation along the paravertebral area [did] not elicit complaints of pain.  The range of motion appears to be within normal limits.  Sitting straight-leg raising is normal.  Supine straight leg raising is normal.  The claimant transfers from a sitting to lying position with mild difficulty.  She is able to sit up from a lying position with her legs fully extended and touch her ankles.  She is able to perform 50% of a normal squat.

*Id.*  Dr. Mumford diagnosed Plaintiff with "chronic neck and back pain secondary to degenerative disc disease with normal range of motion and no evidence of radiculopathy" (AR 522), and "multiple arthralgias" (AR 523).  Dr. Mumford opined that Plaintiff: can lift and/or carry 50lbs "[o]ccasionally," and 25lbs "[f]requently"; can sit, stand, and/or walk 8 hours in an 8 hour workday; and, does not require an assistive device such as a cane or a crutch for ambulation.  AR 523.  "[S]tandard breaks and lunch period[s would] provide sufficient relief" if Plaintiff "needs to alternate sitting and standing," and would "provide sufficient relief [for Plaintiff] to . . . work for 8 hours." AR 523–24.  Dr. Mumford noted Plaintiff had "[n]o restrictions" in "[c]limbing ramps/stairs"; "[c]limbing ladder[s]/scaffolds"; "[b]alancing"; "[s]tooping/[b]ending"; "[k]neeling"; "[c]rouching/[s]quatting"; and, "[c]rawling." AR 523.  Dr. Mumford determined Plaintiff had "[n]o" limitations in "[r]eaching"; "[f]ingering"; "[h]andling [o]bjects"; "[h]earing"; "[s]eeing"; "[s]peaking"; and, "[t]raveling." AR 524.  Dr. Mumford concluded that there are "[n]o" environmental restrictions caused by Plaintiff's impairments, including "[h]eights"; "[m]oving [m]achinery"; "[t]emperature [e]xtremes"; "[c]hemicals"; "[d]ust"; "[n]oise"; and, "[v]ibration[s]." *Id.*

7

On March 21, 2013, Dr. Perry performed a physical examination of Plaintiff, which revealed: Plaintiff had a "somewhat limited" range of motion; "[f]lexion chin-to-chest distance of 3 fingerbreadths"; "extension . . . to 20 degrees"; "[r]otation to about 60 degrees bilaterally"; and, a positive Spurling's test. AR 564. Plaintiff complained of "persistent . . . neck pain." *Id*. Dr. Perry diagnosed Plaintiff with "[p]ersistent neck pain"; "[p]ersistent right upper extremity radicular pain"; "C4-5 and C5-6 disk degeneration"; and, "right-sided neural foraminal stenosis at C4-5 and C5-6." *Id*. Dr. Perry recommended "a new MRI [magnetic resonance imaging] scan of [Plaintiff's] cervical spine to evaluate the extent of neurologic impingement." *Id*. In the interim, Dr. Perry suggested Plaintiff undergo physical therapy. *Id*.

On April 9, 2013, a MRI scan of Plaintiff's cervical spine performed at Steinberg Diagnostic Medical Imaging Centers revealed:

> 1. Straightening and mild reversal of the normal cervical lordosis. Multilevel mid cervical spondylosis is present unchanged from the prior study. Degenerative changes most significant at the C4-C5 and C5-C6 levels where there is diffuse annular bulging contributing to mild/moderate canal stenosis. Uncinate arthropathy contributes to moderate neural foraminal narrowing bilaterally.

> 2. Mild degenerative changes are also present at the C3-C4 and C6-C7 levels as described above without significant canal stenosis. Mild neural foraminal narrowing is present at the C6-C7 level. Degenerative changes are present to lesser extent at the remaining levels.

AR 527–28.

On May 10, 2013, Dr. Ho Viet Dzung, a pain medicine specialist, administered epidural steroid injections to Plaintiff's C5 and C6 vertebrae. AR 631. In doing so, Dr. Dzung noted that Plaintiff "has failed conservative therapy including physical therapy and NSAIDs, as well as other medications and treatments, without significant long-term benefit." *Id*. Dr. Dzung reported that "30 minutes following the diagnostic procedure, the patient reports approximately 100% relief of the pain symptoms. Long term pain relief is expected as the steroid reaches steady state concentrations over the next three to five days." AR 632.

On May 23, 2013, Plaintiff visited Dr. Perry:

> to review her EMG [electromyography], nerve conduction studies, as well as her injections that were performed. [Plaintiff] states that the injections Dr. Tsung [sic] performed in her cervical spine . . . gave her about 60%-70% relief of her symptoms

8

for about 3 days. [Plaintiff] states that this did not give much and she still continued to have some right shoulder pain. She is now complaining of the same pain, as well as new pain up in between her shoulder blades.

AR 562. Dr. Perry recommended "interferential injections directed at the C3-4 level, the level above the previous injections. . . . [I]f this level does give her significant relief, but is very short lasting as well, our recommendation is to probably move forward with surgical intervention directed at . . . C4-5 and C5-6" levels. *Id.*

On June 7, 2013, Dr. Dzung gave epidural steroid injections to Plaintiff at her C4, C5, and C6 vertebrae, again noting that Plaintiff had "failed conservative therapy." AR 605.

On June 20, 2013, Plaintiff visited Dr. Perry's office again and "state[d] that the second round of injections gave her about 70% relief for 11 days. She state[d] that her pain came back. [Plaintiff was] still very apprehensive about surgical interventions, and [was] set up for one more injection of her cervical spine." AR 561. Dr. Perry's assistant recommended moving forward with "the third injections directed at the levels of C3-4, as well as C4-5, and C5-6." *Id.* Dr. Perry and his assistant "believe[d] . . . surgical intervention . . . may give [Plaintiff] significant relief of her symptoms." *Id.*

On July 26, 2013, Dr. Dzung applied epidural steroid injections to Plaintiff's C4, C5, and C6 vertebrae, repeating that Plaintiff had "failed conservative therapy." AR 580.

On August 8, 2013, Plaintiff visited Dr. Perry's office to follow up with her injections for a third time. AR 575. Plaintiff reported that her "symptoms have recurred and now she feels that they are worse than they were prior to her injection." *Id.* Because Plaintiff's symptoms persisted "for several years despite treatment that has included medication, physical therapy[, and] cervical injections," Dr. Perry recommended proceeding with "anterior cervical decompression and fusion at C4-5 and C5-6." *Id.*

From April 29 through August 13, 2013, Plaintiff received treatment for her neck and upper extremity pain at the Innovative Pain Center. *See generally*, AR 694–761. Plaintiff told her physicians at the Innovative Pain Center that relief from the epidural steroid injections wore off after a few days. *Id.*

On May 8, 2014, Dr. Babuk Ghuman, an anesthesiologist, performed a "[b]ilateral C6 selective nerve root block" procedure on Plaintiff's cervical spine. AR 655. On May 15, 2014, Plaintiff followed up with Dr. Ghuman for "re-evaluation of her condition." AR 656. Plaintiff reported that:

> she had worsening symptomology in regards to her neck, periscapular, interscapular region, [and] her left upper extremity. . . . She states her symptoms have worsened from 7/10 to 10/10 after injection, which gave her no substantial relief. She is quite concerned, as her previous injections did give her substantial relief approximately a year ago.

*Id.* Dr. Ghuman recommended "site-specific injection therapy in the form of a bilateral C5 selective nerve root blocks . . . . [Dr. Ghuman] continue[d] her medication regimen," including "Lyrica," "Celebrex," and "tramadol." *Id.* At this visit, Dr. Ghuman also provided Plaintiff with "Duexis," "compound cream," and "Toradol." *Id.*

On August 18, 2015, a MRI scan taken of Plaintiff's cervical spine taken at Steinberg Diagnostic Medical Imaging Centers revealed "[m]ild degenerative disease/spondylosis changes. Congenital narrowing of the canal as well as disc bulges contributes to moderate spinal stenosis C4-C5. Mild spinal stenosis C5-C6." AR 787. A reviewing physician noted that this impression "appear[ed] slightly more advanced compared with the prior study." *Id.*

On September 18, 2015, Dr. Amir Nickam, a consultative examiner, performed an Independent Medical Evaluation of Plaintiff and reviewed her medical records dating back to January 28, 2011. AR 789–93. Under a section titled "Apparent Validity/Consistency/Effort," Dr. Nickam checked boxes indicating that Plaintiff's "[t]enderness," "[s]imulation," "[d]istraction," "[r]egional [d]isturbance (sensory/motor)," "[o]bservation (overreaction)," "Burns Test," "[p]ain [p]attern," "[r]ecords [d]ocument [p]revious [i]nappropriate [b]ehavior," and "[i]mpairment [c]onsistent with [k]now [sic] [p]athology" were all "appropriate." AR 793. In addition, a Spurling's test on Plaintiff's neck came back negative. *Id.* However, Dr. Nickam noted tenderness and decreased range of motion in various places of Plaintiff's neck and back. AR 794. Dr. Nickam diagnosed Plaintiff with "[c]hronic [n]eck pain due to degenerative disk spondylosis, congenital narrowing of the canal, as well as disk bulges contributing to moderate spinal stenosis at C4-C5 and C5-C6, which appeared slightly more advanced compared to the prior study per MRI," and

"[c]hronic [l]ow back pain without radiculopathy." AR 795. Dr. Nicknam opined that "conservative treatment including epidural steroid injection" had failed, and that Plaintiff is "impaired and disabled." *Id.*

On October 23, 2015, Dr. Nicknam filled out a Disability Impairment Questionnaire. AR 797–801. Dr. Nicknam again diagnosed Plaintiff with "[c]hronic [n]eck pain w/ degenerative disc spondylosis, congenital narrowing of canal, and disc bulges due to moderate spinal stenosis at C4-C5 and C5-C6" and "[c]hronic [l]ow back pain w/o radiculopathy." AR 797. Dr. Nicknam estimated that Plaintiff could "perform a job in a seated position" for three hours, and "a job standing and/or walking" for three hours, in an 8-hour workday. AR 799. Dr. Nicknam opined that Plaintiff must get up from a seated position to move around "every 30-60 minutes," and Plaintiff had to return to a seated position from a standing position every "10-15 minutes." *Id.* Dr. Nicknam did not believe it was medically necessary for Plaintiff to elevate the legs while sitting. *Id.* Dr. Nicknam checked boxes indicating that Plaintiff could "never" lift ten pounds or more, and "occasionally" lift anywhere between zero to ten pounds.[5] *Id.* Dr. Nicknam also checked boxes indicating that Plaintiff could "frequently" carry zero to five pounds; occasionally carry five to ten pounds; and, never carry ten pounds or more.[6] *Id.* Dr. Nicknam checked "no" when asked whether Plaintiff had "significant limitations in reaching, handling, or fingering."[7] AR 800. Dr. Nicknam checked "yes" when asked whether Plaintiff's "symptoms [will] likely increase if she[] were placed in a competitive work environment," explaining that such an environment "[m]ay cause aggravation of her neck pain." *Id.* Dr. Nicknam noted that Plaintiff's "experience of pain, fatigue, or other symptoms" would frequently interfere with her attention and concentration in an average 8-hour workday. *Id.* Dr. Nicknam checked "yes" when asked whether Plaintiff "need[s] to take unscheduled breaks to rest at unpredictable intervals during an 8-hour workday," elaborating that Plaintiff needs to take breaks "possibly every 3-4 hours" for about "10-15 min[utes]." *Id.* Dr. Nicknam checked a box indicating

---

[5]     "Occasionally" in this section is defined as "up to 1/3 of an 8-hour day." AR 799.

[6]     "Frequently" in this section is defined as "1/3 – 2/3 of an 8-hr. day." *Id.*

[7]     Dr. Nicknam apparently believed Plaintiff had some limitations in reaching, handling, or fingering, as evidenced by his underlining of the word "significant" in answering this question. AR 800.

Plaintiff is "likely to be absent from work as a result of her[] impairments or treatment . . . [m]ore than three times a month."  AR 801.  Dr. Nickham determined that Plaintiff's symptoms and limitations apply as far back as December 1, 2010.  *Id*.

**D.    Plaintiff's Symptom Testimony**

Plaintiff appeared and testified with the assistance of a Spanish language interpreter at both her administrative hearings.  AR 87–111, AR 112–31.

**1.    First Administrative Hearing**

On examination by ALJ Bennett during the November 21, 2014 administrative hearing, Plaintiff testified that she was born on June 14, 1960, and was "54 years old" at the time of the hearing.  AR 91.  Plaintiff does not have a driver's license "[b]ecause [she] never drive[s]."  *Id*. Plaintiff completed the sixth grade, and has not had any training or other schooling after that time. AR 92.  Plaintiff previously worked as a housekeeper (*id*.), as well as a "homecare attendant" (AR 93).

On examination by her attorney, Plaintiff testified that she stopped working because she no longer has "strength on [her] arm and [she] always [has] a lot of pain on [her] neck and [her] arm." AR 94.  The pain affects Plaintiff's "head on the right side[] . . . up to [her] waist."  *Id*.  Plaintiff described the pain as "burning and . . . numbness in [her] neck and arms."  AR 95.  Plaintiff experiences pain when she "move[s her] neck or move[s her] upper extremities."  *Id*.  Plaintiff "change[s] position and sometimes . . . sit[s] down [at night] so that [she] can rest a little bit [instead] of . . . lying down," because she experiences "too much pain" in just one position.  *Id*.  Plaintiff wore a neck brace to her hearing, which her physician advised her to wear when she feels "a lot of pain." *Id*.  When Plaintiff experiences "too much pain [moving her neck, she] cannot hold it; if [she does not] have pain, [she] can move [her neck] from one side to another and up and down."  AR 96. Plaintiff feels pain "especially on the right side" of her neck.  *Id*.  Plaintiff has to "constantly mov[e] and . . . exercise . . . [her] neck" because keeping her neck "in one position . . . causes pain."  *Id*. Plaintiff recalled having three injections on the "right side" of her neck, "below [her] ear."  *Id*. Plaintiff's physicians subsequently informed her that "injections and the medications won't help [her] anymore, but [she] definitely qualif[ies] for surgery."  AR 97.  Plaintiff currently takes

"tramadol" to treat her "pain" and "headaches"; however, the tramadol "alters [her] nerves and . . . affects [her] sleep." *Id*. At the time of the hearing, Plaintiff suffered from "high blood pressure," "problems with [her] vision," and "osteopenia." AR 98. Plaintiff's joints "hurt a lot"; although it is recommended that she walks to alleviate her pain, "sometimes [Plaintiff finds] it[] hard [to walk] because of the . . . problems that [she has] with [her] neck." *Id*. Plaintiff experiences headaches "almost every day." *Id*. Plaintiff sometimes stays "up all night and just sleep[s] for two or three hours and then [she] wake[s] up [around] 8:30 or 9:00 in the morning." AR 99.

To pass time during the day, Plaintiff "talk[s] over the phone" and watches television. *Id*. If her pain is manageable, Plaintiff does "small things" like "prepare breakfast" and "wash the dishes." *Id*. If she begins experiencing a "burning sensation on the right side of [her] neck" while doing chores, Plaintiff will take a break for "half-an-hour or one hour." *Id*. Plaintiff shops for groceries with her "daughter-in-law or [her] son." *Id*. Plaintiff can sit in an office chair for about "one hour[ to an] hour-and-a-half" at a time. AR 100. Plaintiff can stand in one position for "one . . . or two hours" before she has to sit down. AR 100–01. Plaintiff can walk for 30 to 45 minutes before she has to sit down. AR 101. Plaintiff was unsure how much weight she could lift at a time. *Id*. Plaintiff's attorney had no further questions, but noted that Plaintiff:

> has had subsequent MRIs [since her MRI in 2013] that have showed advancement in her degeneration in her neck. . . . [Plaintiff's] doctor also indicated that there is no radiculopathy, yet the claimant has had at least three or four nerve blocking injections and the doctors have indicated, at least in 2014, that she's a candidate for neck surgery between C3 and C6.

*Id*.

On reexamination by ALJ Bennett, Plaintiff testified that she has had "two surgeries" on one eye and "one surgery" on the other. AR 103. These surgeries failed to correct her vision completely, but Plaintiff is now able to see with glasses. AR 104. Plaintiff also had surgery on April 1, 2010 to remove a "tumor on [her] left lung." *Id*. Although the surgery was successful, Plaintiff developed "asthma[-like] symptoms" afterwards. *Id*. Plaintiff's counsel clarified that Plaintiff initially reported "60/70 percent" relief from her previous steroid injections, but she is now "concerned that the current injections [have] not [had] any benefit." AR 104–05.

1

## 2.    Second Administrative Hearing

On examination by ALJ Bennett during the May 19, 2017 administrative hearing, Plaintiff testified that she previously worked as a housekeeper at the Cerritos Sheraton Hotel in California.[8] AR 117.  Thereafter, Plaintiff "cleaned . . . bathrooms [and slot machines]" in casinos.[9]  *Id*.  Plaintiff stopped working in December 2010 because she began having problems with her neck.  *Id*.  On examination by her attorney, Plaintiff explained that she stopped working because she:

> began to feel a lot of pain in [her] neck.  [She] was not able to move it.  [Plaintiff] thought that it was something light and simple and in about six months [she] began to receive medical treatment for it.  Afterwards, [Plaintiff] was referred for some MRIs, physical therapy, [and] medications.  [During this time, Plaintiff's] . . . hands would get swollen and, subsequently, [her] condition worsened even more.

AR 118.  Plaintiff can make "slow movements" with her neck, but not "in a sudden manner."  *Id*.  It causes "plenty" of pain for Plaintiff to move her neck side-to-side.  *Id*.  Plaintiff has difficulty "opening jars," "turning doorknobs," and "apply[ing] . . . strength with [her] right hand" generally because she has "a lot [of] pain in that area."  AR 118–19.  Plaintiff experiences pain radiating from her neck all the way to her legs on the right side of her body, but the pain is starting to affect the left side of her body as well.  AR 119.

Plaintiff's hand gets numb when she performs activities such as "writing or typing or buttoning."  AR 119–20.  Plaintiff can sit for "one hour," stand for "40/45 minutes", and "walk for "[h]alf-an-hour" before readjusting her position.  AR 120.  Plaintiff can lift and carry a gallon of milk, "but not for very long."  AR 120–21.  Plaintiff lives in a two-story house with her husband, but is only able to use the stairs "a little."  AR 121.  Plaintiff has not cleaned the house herself in a "very long time," because she "suffer[s] from a lot of pain and a lack of strength."  *Id*.  Plaintiff can only cook a "very light" meal for herself.  *Id*.  Plaintiff goes grocery shopping with her husband,

---

[8]      The ALJ asked Plaintiff if she worked as a housekeeper at the Cerritos Sheraton Hotel "from 2002 to 2007 . . . or 2008."  AR 117.  However, a Work Background form completed by Plaintiff reveals that she worked at the Cerritos Sheraton Hotel from October 1994 to March 2005.  AR 390.

[9]      The hearing transcript is unclear as to where, and for how long, Plaintiff worked following her housekeeping job at the Cerritos Sheraton Hotel.  The Work Background form referenced in the previous footnote shows that Plaintiff worked at the Venetian Resort and the Red Rock Casino Resort & Spa from July 2005 through April 2008.  *Id*.  It appears Plaintiff was unemployed from May 2008 through December 2009.  *Id*.  Plaintiff worked as a home attendant in Los Angeles, California, from January through December 2010.  *Id*.

who "carries everything." AR 122.  Plaintiff can "bathe [herself] and get dressed," although it takes "a while" for her to do so.  *Id*.  Plaintiff does not use neck braces because she "cannot tolerate them." *Id*.

Plaintiff "suffer[s] from a lot of depression," which causes her to lose "incentive . . . to do anything." *Id*.  Plaintiff "cr[ies] often. . . . [She] feel[s] so depressed that life lacks any meaning for [her]."  AR 123.  Plaintiff has "a lot of headaches, a lot of dizziness, a lot of nervous conditions" almost "every day."  *Id*.  Several physicians prescribe medications to treat Plaintiff's depression. AR 123–24.  Plaintiff generally feels "nervous . . . all the time," and has "panic attacks" at night. AR 125.  Plaintiff feels "agitated" in a crowd, which she defines as a gathering of "10 people, more or less."  AR 125–26.  Plaintiff "tend[s] to forget almost everything" lately.  AR 126.  Plaintiff has "difficulty . . . maintaining [her] attention and concentration."  *Id*.  Plaintiff describes her sleep as "terrible."  *Id*.  "[A]ll of the medications Plaintiff is prescribed have significant side effects that "interfere with [her] ability to work," including "dizziness," "anxiety," "pain in [her] legs," and "headaches."  AR 127.

**E.  <u>Vocational Expert ("VE") Testimony</u>**

VE Bernard Preston testified at Plaintiff's May 19, 2017 administrative hearing that:

> [Plaintiff's past relevant work as a] housekeeper, DOT number 323.687-018, physical demand at the light level, SVP skill level 2, [was an] unskilled [job].  The next position [Plaintiff worked as], porter, DOT number 381.687-018, physical demand is the medium level, SVP skill level 2, [was also an] unskilled [job].

AR 128.[10]  ALJ Bennett then asked VE Preston to assume a hypothetical individual that included, a person who:

> could lift 20 pounds occasionally and 10 pounds frequently.  This person could stand and walk up to six in eight [hours]; sit up to six in eight [hours] with occasional postural limitations, except no climbing of ladders, ropes, and scaffolds; also, [this person cannot] work at heights or around dangerous moving machinery. The left arm reach for overhead movement would be only occasional.  Given these limitations, could such an individual do the job of housekeeper?

AR 128–29.  VE Preston testified that the foregoing hypothetical person could perform Plaintiff's past relevant work as a "housekeeper."  AR 129.

---

[10]      Only VE Preston's testimony at the second administrative hearing is discussed because ALJ Bennett's initial decision, based on the VE testimony given at the first administrative hearing, was remanded, in part, in order to supplement the step five analysis of the evaluation process.  AR 173.

On examination by Plaintiff's attorney, VE Preston was asked to build on ALJ Bennett's hypothetical by additionally assuming a person who:

> needed a sit/stand option so that they [sic] would only be able to be standing about 40 to 45 minutes at a time before needing to sit for 15 minutes[. W]ould they [sic] be able to perform the claimant's past relevant work [as a housekeeper]?

*Id.* VE Preston testified that the foregoing hypothetical person would not be able to work as a housekeeper. *Id.* VE Preston noted that being off task at a job "over 20 percent would eliminate competitive work, which is 1.6 hours." *Id.* VE Preston stated that "[t]wo or more [sic] days per month is an acceptable [number of absences]" at work. AR 130.

**F.    Issues Presented**

Plaintiff contends the ALJ erred by improperly: (1) according "little weight" to Plaintiff's examining physician's opinion (ECF No. 13 at 8:24–11:3), and (2) finding Plaintiff not credible (*id.* at 11:5–12:19).

**1.    Plaintiff's Examining Physician's Opinion**

In accordance with Social Security regulations, courts have "developed standards that guide our analysis of an ALJ's weighing of medical evidence." *Ryan v. Comm'r of Soc. Sec.*, 528 F.3d 1194, 1998 (9th Cir. 2008) (internal citation omitted). Courts "distinguish among the opinions of three types of physicians: (1) those who treat the claimant (treating physicians); (2) those who examine but do not treat the claimant (examining physicians); and (3) those who neither treat nor treat the claimant (nonexamining physicians)." *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995). For claims filed before March 27, 2017, as is the case here, "the opinion of a treating physician is [given] greater weight than that of an examining physician, [and] the opinion of an examining physician is entitled to greater weight than that of a nonexamining physician." *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (internal citation omitted); *see also* 20 C.F.R. §§ 404.1527, 416.92.

"If a treating or examining doctor's opinion is contradicted by another doctor's opinion, the ALJ may only reject it by providing specific and legitimate reasons supported by substantial evidence." *Garrison*, 759 F.3d at 1012 (internal citation omitted). "This is so because, even when contradicted, a treating or examining physician's opinion is still owed deference and will often be

'entitled to the greatest weight . . . even if it does not meet the test for controlling weight.'" *Id.*, *citing Orn v. Astrue*, 495 F.3d 625, 633 (9th Cir. 2007). To satisfy the "substantial evidence" requirement of the specific and legitimate reasons standard, the ALJ should set forth a "detailed and thorough summary of the facts and conflicting clinical evidence, stat[e] his interpretations thereof, and mak[e] findings." *Garrison*, 759 F.3d at 1012, *citing Reddick v. Chater*, 157 F.3d 715, 725 (9th Cir. 1998). "The ALJ must do more than state conclusions. He must set forth his own interpretations and explain why they, rather than the doctors' are correct." *Id.* (internal citation and quotation marks omitted). The ALJ can never arbitrarily substitute his own opinion for the opinion of competent medical professionals. *Tackett*, 180 F.3d at 1102–03.

Here, the ALJ provided three reasons for attributing little weight to the opinion of Plaintiff's examining physician, Dr. Amir Nicknam: (a) "[Dr. Nicknam's] opinion is not supported by or consistent with the objective medical evidence, x-rays, MRIs, physical examinations, or record as a whole"; (b) "Dr. Nicknam examined the claimant in September 2015, nearly nine months after" Plaintiff's "date last insured" for disability benefits; and, (c) Dr. Nicknam's opinion is "not supported by or consistent with his own examination of the claimant."[11] AR 32. Each of these reasons is discussed below.

a.    The ALJ's summary reference to medical records inconsistent with Dr. Nicknam's opinion was not a specific and legitimate reason, supported by substantial evidence, to afford little weight to Dr. Nicknam's opinion.

A medical opinion may be rejected if it is unsupported by medical findings. *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009); *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001). An ALJ may also discredit physicians' opinions that are unsupported by the record as a whole. *Batson*, 359 F.3d at 1195. However, a sweeping reference to objective medical evidence is an inadequate basis to reject a medical opinion. *McAllister v. Sullivan*, 888 F.2d 599, 602 (9th Cir. 1989) (an ALJ's rejection of a physician's opinion on the ground that it was contrary to clinical findings in the record was "broad

---

[11]    Plaintiff addresses the gaps in her treatment history as an independent reason supporting ALJ Bennett's decision to offer little weight to Dr. Nicknam's opinion. ECF No. 13 at 10:7. However, both Defendant (ECF No. 14 at 5:2–13) and the ALJ (AR 32) discuss Plaintiff's deviation from treatment together with their analyses of inconsistency between Dr. Nicknam's opinion and the medical record. The Court does the same here.

and vague, failing to specify why the ALJ felt the treating physician's opinion was flawed"). Consistent with this proposition, Plaintiff argues "[t]he ALJ did not explain exactly how the objective examination findings or imaging studies were inconsistent with any specific aspect of the limitations Dr. Nickam assessed"; nor did the ALJ make an "attempt to explain how a gap in Plaintiff's treatment history would invalidate any of the limitations Dr. Nickam described." ECF No. 13 at 10:16–17 and 10:23–24. Plaintiff is right.

In fact, other than summarizing the medical evidence, including Dr. Nickam's opinion, the ALJ simply concluded that Dr. Nickam's "opinion is not supported by or consistent with the objective medical evidence, x-rays, MRIs, physical examinations, or record as a whole, . . . ." AR 32. This statement lacks the specificity and support required by law. *Garrison*, 759 F.3d at 1012; *McAllister*, 888 F.2d at 602. Moreover, the ALJ's findings, in comparison to Defendant's detailed analysis, demonstrates that it is Defendant, not the ALJ, who provided a list of alleged discrepancies between Dr. Nickam's opinion and the medical evidence. ECF No. 14 at 4:26–27, *citing* AR 28–29, 564; *id.* at 5:5, *citing* AR 29, 653; *id.* at 5:7–8, *citing* AR 29, 787; *id.* at 5:3–4, *citing* AR 29, 564 (all citations by Defendant were to the Administrative Record and not to any findings of inconsistency made by the ALJ).

Well settled law holds that the district court may only affirm the ALJ's decision on grounds upon which he relied. 42 U.S.C. § 405(g); *Stout*, 454 F.3d at 1054. Accordingly, the Court may not affirm or reject the ALJ's determination based on Defendant's argument. *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003). Because the ALJ's findings regarding the inconsistencies between Dr. Nickam's opinion and the objective medical evidence was conclusory, this finding is an insufficient basis to deny Plaintiff's Social Security disability benefits.

        b.    Despite the ALJ's failure to sufficiently specify the reason for affording little weight to Dr. Nickam's opinion based on inconsistency, the ALJ properly afforded little weight to Dr. Nickam's opinion for two other reasons.

              i.    *The ALJ properly afforded little weight to Dr. Nickam's opinion because Dr. Nickam's opinion was untimely.*

Well settled law establishes that evidence from outside the insured period in a case is of limited relevance. *Turner v. Comm'r of Soc. Sec.*, 613 F.3d 1217, 1223–24 (9th Cir. 2010) (date of

social worker's opinion rendered more than a year after the date last insured was a germane reason to not address the opinion); *Johnson v. Astrue*, 303 F. App'x 543, 545 (9th Cir. 2008) (affirming ALJ's rejection of medical opinions that were remote in time, and reliance on more recent opinions). In this case, Dr. Nickam performed an Independent Medical Evaluation of Plaintiff on September 18, 2015, which was long after "Plaintiff last met the insured status requirement of the Social Security Act on December 31, 2014." AR 24; *see also* AR 28. "Plaintiff needed to prove her disability by" December 31, 2014, not September 18, 2015. ECF No. 14 at 4:12–13 (internal citations and quotation marks omitted); AR 28, 32; *Turner*, 613 F.3d at 1223–24; *Johnson*, 303 F. App'x at 545. For this legitimate reason, the ALJ gave "little weight" to Dr. Nickam's opinion. AR 32.

Plaintiff nonetheless alleges the ALJ's decision to afford more weight to Dr. Mumford's opinion over Dr. Nickam's opinion was reversible error because "Dr. Mumford . . . did not indicate that he reviewed Plaintiff's records other than the most recent MRI of the cervical spine." ECF No. 13 at 10:12–14 (internal citation omitted). Plaintiff contends that "Dr. Nickam reviewed all of Plaintiff's records dating back to January[] 2011, and estimated that the limitations he described had been present at the same level since December[] 2010." ECF No. 13 at 10:9–11, *citing* AR 789–801. In opposition, Defendant argues that Dr. Nickam, as an examining physician, saw Plaintiff for the first time on September 18, 2015. ECF No. 14 at 4:16–17 (internal citation omitted). In contrast, "consultative examiner Dr. David Mumford, to whom the ALJ gave some weight, actually examined Plaintiff during the insured period . . . ." *Id*. at 4:17–19 (internal citations omitted).

When confronted with contradictory opinions from two examining physicians, the ALJ reasonably gave more weight to the medical opinion offered prior to Plaintiff's date last insured for disability benefits and consistent with the accompanying treatment records. AR 32. "Dr. Mumford found the claimant capable of performing the full range of medium work, lifting and/or carrying fifty pounds occasionally, twenty-five pounds frequently, standing and/or walking 8 hours in an 8-hour workday, and sitting 8 hours in an 8-hour workday." AR 31. Dr. Nickam, in contrast, concluded Plaintiff suffered from debilitating functional limitations. AR 795. In the end, the ALJ did temper

Dr. Mumford's opinion by giving "claimant the benefit of the doubt and f[ou]nd that she was further restricted to the light exertional level, occasional postural activity, no climbing of ladders, ropes or scaffolds, and no work around workplace hazards."  AR 31.

Based on the foregoing, the Court concludes the ALJ properly accorded little weight to Dr. Nicknam's belated opinion in favor of a more well-supported and timely opinion from another consultative examiner made during the relevant adjudicatory period.

> ii.    The ALJ properly afforded little weight to Dr. Nicknam's opinion as his treatment records do not support his assessment of debilitating functional limitations.

The appropriate factors when evaluating a medical opinion include the amount of relevant evidence that supports the opinion, the quality of the explanation provided in the opinion, and the consistency of the medical opinion with the record as a whole.  *Lingenfelter v. Astrue*, 504 F.3d 1028, 1042 (9th Cir. 2007); *Orn*, 495 F.3d at 631.  A physician's opinion may be rejected if it is unsupported by the physician's treatment notes.  *Connett*, 340 F.3d at 875.  Incongruity between a doctor's medical opinion and treatment records is a specific and legitimate reason to discount a doctor's opinion.  *Tommasetti v. Astrue*, 533 F.3d 1035, 1041 (9th Cir. 2008).  This is because a provider's observations must be "read in the context of the overall diagnostic picture" a provider draws.  *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001).

Defendant argues that Dr. Nicknam's treatment records are inconsistent with the doctor's own assessment of Plaintiff's debilitating functional limitations.  Specifically, while Dr. Nicknam concluded in his Independent Medical Evaluation that "Plaintiff had very limited abilities [sic] to lift, carry, sit, stand, and walk such that she is capable of any substantial work activity," Dr. Nicknam's physical examination "only documented neck and back tenderness along with subjective complaints of pain. . . . Otherwise, various tests, including Spurling's and Romberg's tests, were both negative, and Dr. Nicknam observed full 5/5 motor strength, no atrophy, no spasms and normal gait."  ECF No. 14 at 5:21–22, *citing* AR 794 (internal citations omitted); 5:15–18, *citing* AR 799 (internal citations omitted).  Defendant further argues that "Plaintiff sat upright, was fully alerted and oriented, and did not use an assistive device" at this evaluation.  *Id*. at 5:18–19, *citing* AR 794. Setting aside Defendant's argument regarding Plaintiff's presentation at her evaluation, which is not

necessarily inconsistent with other findings Dr. Nickam made (*see* AR 799), Defendant is correct that Dr. Nickam's Independent Medical Evaluation findings are inconsistent with his treatment records.

In addition to the above findings, Dr. Nickam documented negative Spurling's and Romberg's tests, full 5/5 motor strength, negative atrophy or spasm, and normal gait. AR 795. Dr. Nickam also checked boxes indicating that Plaintiff's "[t]enderness," "[s]imulation," "[d]istraction," "[r]egional [d]isturbance (sensory/motor)," "[o]bservation (overreaction)," "Burns Test," "[p]ain [p]attern," "[r]ecords [d]ocument [p]revious [i]nappropriate [b]ehavior," and "[i]mpairment [c]onsistent with [k]now [sic] [p]athology" were all "appropriate." AR 793. Dr. Nickam also "indicated that the claimant had no significant limitations with regards to reaching, handling or fingering." AR 32, *citing* AR 800. In contrast, Dr. Nickam stated that Plaintiff is "impaired and disabled" (AR 795) based upon "[p]ainful and limited abduction (up to 100 degree[s]) due to neck pain" and "tenderness" in her back and neck. AR 794. Dr. Nickman's finding of substantially normal functioning, even in light of neck pain and tenderness, are simply inconsistent with a finding of disability. Accordingly, the Court finds the ALJ properly discounted Dr. Nickam's opinion based on the inconsistency between his medical records and his conclusion.

## 2.    The ALJ's Credibility Determination

The ALJ must engage in a two-step analysis when evaluating whether a claimant's testimony concerning pain, symptoms, and level of limitation is credible. *Garrison*, 759 F.3d at 1014. First, "the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Lingenfelter*, 504 F.3d at 1036, *citing Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc). Second, if there is no evidence of malingering, "the ALJ can reject the claimant's testimony concerning the severity of his symptoms only by offering specific, clear and convincing

reasons for doing so."[12] *Garrison*, 759 F.3d at 1014–15 (internal citation omitted).  An ALJ's finding regarding a claimant's credibility must be properly supported by the record and sufficiently specific to ensure a reviewing court that the ALJ did not "arbitrarily discredit" a claimant's subjective testimony.  *Thomas*, 278 F.3d at 958 (citation omitted).

In weighing a claimant's credibility for cases involving ALJ decisions rendered on or after March 24, 2016, including the present case, the ALJ may consider Plaintiff's: (1) daily activities; (2) the location, duration, frequency, and intensity of pain or other symptoms; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, an individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment an individual uses or has used to relieve pain or other symptoms; and, (7) any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.[13]  SSR 16-3p (eff. Mar. 28, 2016), 2016 WL 1119029, at *7; 20 C.F.R. §§ 404.1529(c), 416.929 (c).  The ALJ is instructed to "consider all of the evidence in an individual's record," "to determine how symptoms limit ability to perform work-related activities."  SSR 16-3p, 2016 WL 1119029, at *2.  A claimant's statements about his pain or other symptoms alone will not establish that he is disabled.  20 C.F.R. § 416.929(a)(1); 42 U.S.C. § 423(d)(5)(A).  And, a claimant is not entitled to benefits under the Social Security Act unless the claimant is, in fact, disabled, no matter how egregious the ALJ's errors may be.  *Strauss v. Comm'r of the Soc. Sec. Admin.*, 635 F.3d 1135, 1138 (9th Cir. 2011).

---

[12]      In its Cross-Motion to Affirm and Opposition to Plaintiff's Motion to Remand, Defendant "maintains that [the clear and convincing reasons] standard [used when reviewing an ALJ's decision to discredit a claimant's allegations] is inconsistent with the deferential substantial evidence standard set forth in 42 U.S.C. § 405(g) and with agency regulations and rulings . . . ."  ECF No. 14 at 6, n.5.  Notwithstanding, the Ninth Circuit has employed the clear and convincing reasons standard when reviewing an ALJ's decision to discredit a claimant's allegations.  *See Burrell v. Colvin*, 775 F.3d 1133, 1136-37 (9th Cir. 2014); *see also Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014); *Robbins v. Soc. Sec. Admin*, 466 F.3d 880, 883 (9th Cir. 2006).  This Court is bound to follow Circuit precedent.

[13]      SSR 96-7p was superseded by SSR 16-3p in March 2016.  SSR 16-3p "eliminat[es] the use of the term 'credibility' .... [to] clarify that subjective symptom evaluation is not an examination of an individual's character."  SSR 16-3p, available at 2016 WL 1119029, at *1 (Mar. 16, 2016).  However, both regulations require an ALJ to consider the same factors in evaluating the intensity, persistence and limiting effects of an individual's symptoms.  *Id*. at *7; SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996).

In the present case, the ALJ found, at step one, that Plaintiff's medically determinable impairments could reasonably be expected to cause the alleged symptoms as described by step one of the *Garrison* analysis.  AR 28.  At step two, however, the ALJ found Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely credible for two reasons: (a) Plaintiff's testimony conflicted with the objective medical evidence (AR 27–30); and, (b) Plaintiff responded favorably to conservative treatment (AR 29).[14]  Plaintiff argues these were not clear and convincing reasons to discount her subjective complaints.  ECF No. 13 at 11:5–12:19.

a.   The ALJ improperly discounted Plaintiff's credibility.

When determining the extent of Plaintiff's symptoms, the ALJ must consider whether there are any conflicts between Plaintiff's statements and the objective medical evidence.  20 C.F.R. § 416.929(c)(4).  However, an ALJ may not discredit a claimant's symptom testimony and deny benefits solely because the degree of the symptoms alleged is not supported by objective medical evidence.  *Rollins v. Massanari*, 261 F.3d 853, 857 (9th Cir. 2001); *Bunnell*, 947 F.2d at 346–47; *Fair v. Bowen*, 885 F.2d 597, 601 (9th Cir. 1989).  The objective medical evidence is a relevant factor, along with the medical source's information about the claimant's pain or other symptoms, in determining the severity of a claimant's symptoms and their disabling effects.  *Rollins*, 261 F.3d at 857; 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2).  SSR 16-3 provides that the disability "determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms."

Plaintiff argues the ALJ referred to the objective evidence in general and, therefore, failed to "provide specific reasons to discount the specific aspects of Plaintiff's testimony which establish disability."  ECF No. 13 at 12:6–7.  A review of the Administrative Record shows this to be true.  Although the ALJ carefully summarized the objective medical evidence over three pages (AR 28–

---

[14]        The ALJ did not cite to Plaintiff's gaps in treatment as a separate and independent reason for discounting Plaintiff's credibility.  Instead, the ALJ discussed Plaintiff's deviations from treatment in his summary of her medical record.  AR 29–30.  The Court does the same here.

31), "providing a summary of medical evidence in support of a residual functional capacity finding is not the same as providing clear and convincing *reasons* for finding the claimant's symptom testimony not credible." *Brown-Hunter v. Colvin*, 806 F.3d 487, 494 (9th Cir. 2015). Again, it is Defendant who tallies purported inconsistencies between the objective evidence and Plaintiff's testimony in his Opposition, as he did for Dr. Nicknam's examining opinion (ECF No. 14 at 8:1–17). However, the Court may only affirm the ALJ's decision upon a basis which the ALJ actually relied. 42 U.S.C. § 405(g); *see also Stout*, 454 F.3d at 1054.

The ALJ noted three gaps in Plaintiff's treatment history in his summary of the medical record: "a two year treatment gap from 2011 through 2013;" "a treatment gap from August 2013 through February 2014, a six-month period in which she was not taking any prescription pain medications"; and, "no evidence of further treatment for Plaintiff's neck condition after May 2014 through the date last insured at the end of the year." ECF No. 14 at 7:6, 8–13 (internal citations omitted). Even assuming the ALJ is correct, he still "did not attempt to directly relate this to the credibility of Plaintiff's testimony." ECF No. 13 at 11:27, *citing* AR 29. Defendant claims that despite this apparent failure, the "relationship is obvious in that an individual who experiences such sustained and severe symptoms as to be completely disabled has little reason to display significant gaps in their treatment, the declining of more aggressive treatment modalities, and the lack of prescription pain medications." ECF No. 14 at 7:20–23 (internal citation omitted). But, Defendant's argument fails. Presupposing the ALJ had properly found Plaintiff's symptom testimony was not supported by the objective medical evidence, "the adjudicator may not discredit the claimant's allegations of the severity of pain solely on the ground that the allegations are unsupported by the objective medical evidence." *Bunnell*, 947 F.2d at 343; *see also Rollins*, 261 F.3d at 857; *Fair*, 885 F.2d at 601.

Accordingly, the ALJ simply did not provide a clear and convincing basis for rejecting Plaintiff's symptom testimony as he is required to do. For this reason, the Court finds the ALJ committed an error that cannot be ignored.

1

2

                 b.     <u>The ALJ improperly concluded that Plaintiff was not prescribed conservative treatment</u>.

The ALJ found Plaintiff's physicians recommended only conservative modalities to treat her neck and back pain.  AR 29.  Evidence of conservative treatment is a sufficient basis upon which an ALJ may discount a "claimant's testimony regarding the severity of an impairment."  *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) (citing *Johnson v. Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995)); *see also Tommasetti*, 533 F.3d at 1039 (holding that the ALJ permissibly inferred that the claimant's "pain was not as all-disabling as he reported in light of the fact that he did not seek an aggressive treatment program" and "responded favorably to conservative treatment including physical therapy and the use of anti-inflammatory medication, a transcutaneous electrical nerve stimulation unit, and a lumbosacral corset").

However, the Court finds that Plaintiff was not prescribed only conservative treatment.  In fact, Plaintiff's treatment consisted, in part, of rehabilitative physical therapy (AR 461–94, 564–65) and epidural steroid injections (AR 561–63, 580, 605, 631).  The Ninth Circuit questions whether physical therapy or epidural injections are properly classified as conservative treatment.  *Garrison*, 759 F.3d at 1015.  Moreover, Dr. Dzung and Dr. Nicknam separately noted that conservative treatment had "failed" to provide Plaintiff long term relief.  AR 580, 605, 631, 795; *cf. Tommasetti*, 533 F.3d at 1040 (recognizing that a favorable response to treatment can undermine a claimant's complaints of debilitating pain or other severe limitations).  The Court also acknowledges that Plaintiff experienced adverse side effects along with "[a]ll" of her medications.  AR 127.  Indeed, because the side effects of medication can affect an individual's ability to work, the ALJ should have considered them in his disability determination, which he did not.  SSR 16-3p.

In sum, the ALJ's conclusion that Plaintiff purportedly received only conservative treatment was not a clear and convincing reason to discount her symptoms and complaints.  For this reason, as well as others, the Court recommends remand for further administrative proceedings.

# IV.    REMEDY REQUEST

Plaintiff requests this case be remanded with instructions to pay benefits.  ECF No. 13 at 10:27–11:3; 12:20–13:17.  Plaintiff claims that:

> the need for a sit/stand option, the amount of time Dr. Nickam stated Plaintiff would be off task, the number of absences Dr. Nickam stated Plaintiff would likely have, and the sedentary sitting, standing, walking, and lifting restrictions Dr. Nickam assessed would each, individually, result in a finding of disability if properly credited.

*Id*. at 10:17–21.  Plaintiff also argues that:

> the VE's testimony established that someone who would need to change positions as often as Plaintiff described in her testimony would not be able to perform Plaintiff's past work as a housekeeper. . . . If Plaintiff cannot perform her past work as a housekeeper, then given her age, limited education, and lack of ability to communicate in English, she would be deemed disabled based on 20 C.F.R. § 404, Subpart P, Appendix 2, Rule 202.09 even with the ALJ's RFC finding allowing for light exertional level work.    Additionally, Plaintiff's testimony described limitations in standing, walking, and lifting consistent with no more than sedentary work.  If Plaintiff is limited to sedentary work, she would be deemed disabled based on 20 C.F.R. § 404, Subpart P, Appendix 2, Rule 201.09.  Because the ALJ improperly rejected Plaintiff's testimony, this Court should credit Plaintiff's testimony as a matter of law, find Plaintiff disabled, and remand this matter for payment of benefits.[15]

*Id*. at 12:8–19 (internal citations omitted).  In *Garrison*, the Ninth Circuit discussed its:

> three-part credit-as-true standard, each part of which must be satisfied in order for a court to remand to an ALJ with instructions to calculate and award benefits: (1) the record has been fully developed and further administrative proceedings would serve no useful purpose; (2) the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion; and (3) if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand.

759 F.3d at 1020 (internal citation omitted).  However, the Ninth Circuit is "not convinced that the 'crediting as true' doctrine is mandatory" and has exercised flexibility on occasions and remanding "solely to allow an ALJ to make specific credibility findings."  *Connett*, 340 F.3d at 876.  "*Connett*'s 'flexibility' is properly understood as requiring courts to remand for further proceedings when, even

---

[15]    Medical Vocational Rule 202.09 directs a finding of disabled for a claimant limited to light work who is: "[c]losely approaching advanced age" (defined as age 50-54), "[i]lliterate or unable to communicate in English," and has an "[u]nskilled or no[]" work history.  20 C.F.R. § 404, Subpart P, Appendix 2, Rule 202.09.

Medical Vocational Rule 201.09 directs a finding of disabled for a claimant limited to sedentary work who: is "[c]losely approaching advanced age," has "[l]imited or less" education, and has "[u]nskilled or, no[]" work history.  20 C.F.R. § 404, Subpart P, Appendix 2, Rule 201.09.

though all conditions of the credit-as-true rule are satisfied, an evaluation of the record as a whole creates serious doubt that a claimant is, in fact, disabled." *Garrison*, 759 F.3d at 1021.

Here, there is serious reason to doubt that Plaintiff is disabled under the Social Security regulations based on the potential inconsistencies in her examining physician's opinion as discussed in detail above. Therefore, even if all the elements of the credit-as-true standard are satisfied, remand for further proceedings is appropriate under *Connett*. *Dominguez v. Colvin*, 808 F.3d 403, 410 (9th Cir. 2015) (concluding the district court did not err in remanding case for further administrative proceedings, in light of inconsistent medical opinions); *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1105 (9th Cir. 2014).

## V.   CONCLUSION

The ALJ's generalized reference to the inconsistent medical evidence was not a specific and legitimate reason to discount Dr. Nicknam's opinion. Nonetheless, the ALJ properly found, using the specific and legitimate standard, that Plaintiff's treating physician's opinion should be afforded little weight in favor of Dr. Mumford's opinion because Dr. Nicknam's opinion was given after Plaintiff's date last insured and was inconsistent with his treatment records.

The ALJ failed to demonstrate, using the clear and convincing standard, that Plaintiff's testimony should be discounted because the ALJ cited to the objective medical evidence generally without making a specific finding of inconsistency, and Plaintiff was not prescribed conservative treatment.

## VI.   RECOMMENDATION

1.     IT IS HEREBY RECOMMENDED that Plaintiff's Motion for Reversal and Remand (ECF No. 13) be GRANTED in part and DENIED in part.

2.     IT IS RECOMMENDED that the Motion for Reversal and Remand be GRANTED to the extent Plaintiff requests a remand for further administrative proceedings consistent with this Report and Recommendation of the October 26, 2017 decision rendered by the Administrative Law Judge. On remand, the ALJ should develop the record as necessary and re-evaluate Plaintiff's symptom testimony.

      a.      If the ALJ discounts Plaintiff's symptom testimony, he should provide specific, clear, and convincing reasons for doing so.

      b.      If the ALJ does not discount Plaintiff's symptom testimony, he should determine whether Plaintiff is disabled under 20 C.F.R. § 404, Subpart P, Appendix 2, Rule 201.09 and/or under 20 C.F.R. § 404, Subpart P, Appendix 2, Rule 202.09.

3.      IT IS RECOMMENDED that the Motion for Reversal and Remand be DENIED to the extent Plaintiff requests a remand for an immediate payment of benefits.

4.      IT IS FURTHER RECOMMENDED that the Defendant's Cross Motion to Affirm (ECF No. 14) be DENIED.

DATED this 5th day of February, 2020.

ELAYNA J. YOUCHAH
UNITED STATES MAGISTRATE JUDGE

### NOTICE

Pursuant to Local Rule IB 3-2, any objection to this Finding and Recommendation must be in writing and filed with the Clerk of the Court within fourteen (14) days. The Supreme Court has held that the courts of appeal may determine that an appeal has been waived due to the failure to file objections within the specified time. *Thomas v. Arn*, 474 U.S. 140, 142 (1985). This circuit has also held that (1) failure to file objections within the specified time and (2) failure to properly address and brief the objectionable issues waives the right to appeal the District Court's order and/or appeal factual issues from the order of the District Court. *Martinez v. Ylst*, 951 F.2d 1153, 1157 (9th Cir. 1991); *Britt v. Simi Valley United Sch. Dist.*, 708 F.2d 452, 454 (9th Cir. 1983).